# UNITED STATES v. SOUTH BUFFALO RY. CO. et al.

### Civil Action No. 1464.

District Court, W. D. New York.

Nov. 7, 1946.

Wendell Berge, Asst. Atty. Gen., James E. Kilday, David S. Craig, Robert W. Strange and Robert G. Seaks, Sp. Assts. to Atty. Gen., and George L. Grobe, U. S. Atty., of Buffalo, N. Y., for plaintiff.

Kenefick, Cooke, Mitchell, Bass & Letchworth, of Buffalo, N. Y., (Lyman M. Bass of Buffalo, N. Y., of counsel), Cravath, Swaine & Moore, William W. Robison, George M. Billings, Frank M. McGarry, Hoyt A. Moore, and Bruce Bromley, all of New York City, for defendants.

KNIGHT, District Judge.

This is a suit brought by the United States against the South Buffalo Railway Company (at times hereinafter called South Buffalo), Bethlehem Steel Company (at times hereinafter called Steel Company), and Bethlehem Steel Corporation (at times hereinafter called Holding Company) to enjoin them from violating the so-called Commodities Clause of the Interstate Commerce Act, 34 Stat. 584, 49 U.S.C.A. § 1(8).

This Court has jurisdiction over the subject matter of this suit and the parties.

The Bethlehem Steel Corporation is a Holding Company organized under the laws of the State of Delaware, owning all or substantially all of the stock of 57 subsidiary corporations operating in various states and outside the United States. These latter are companies mining ore, producing materials used in the manufacture of steel, steamship companies, which transport iron ore from mines to subsidiary steel plants, engage in coast-wise shipping principally of products produced by one or more of such subsidiaries, corporations engaged in the manufacture of steel and steel products, and railroad companies.

. The South Buffalo Railway Company was incorporated in 1889 and, of its shares of capital stock of 5000, 4,991 were issued to Lackawanna Iron & Steel Company. In 1903 these shares were transferred to the Lackawanna Steel Company. The remaining nine shares were held as directors qualifying shares. On October 10, 1922, Lackawanna Steel Company conveyed its steel manufacturing plant and other properties at Lackawanna, New York, and contracted to sell its stock in South Buffalo to the Bethlehem Steel Company of New York, Inc. In 1922 the name of Bethlehem Steel Company of New York, Inc., was changed to Bethlehem Iron and Steel Corporation, and the 4,991 shares of stock aforesaid were transferred in 1923 to that company. In 1935 the steel manufacturing plant and other properties at Lackawanna, New York, which had been conveyed to Bethlehem Steel Company of New York, Inc., were conveyed to Bethlehem Steel Company, defendant of that name herein, and in the following year the stock of South Buffalo which had been transferred from Lackawanna Steel Company to Bethlehem Steel Company of New York, Inc., was transferred on the books of South Buffalo to Bethlehem Steel Corporation, defendant herein, organized under the laws of the State of Delaware. The Bethlehem Steel Corporation since 1940 has owned all of the stock of South Buffalo. When Bethlehem Steel Company of New York, Inc., acquired the stock aforesaid of South Buffalo, in 1922, it sold to South Buffalo 75·

miles of track located West of what is termed the Hamburg Turnpike and certain other property, and also leased to it the roadbed under such track and land and other property for 99 years, and the following year leased to it certain additional land and roadbed for 98 years.

The Steel Company owns 1027 acres of land along the Hamburg Turnpike in Lackawanna, New York, and on this are located the manufacturing properties of the Company. An intricate system of tracks is supplied and necessitated to serve the needs of the Steel Company. South Buffalo owns and operates 6 miles of main line track and 81 miles of other track. Of this 81 miles, about 58 miles, with 71 miles of broad and narrow guage track owned by the Steel Company, make up the total trackage serving the plant. The balance of the main track of the South Buffalo serves other properties of the Steel Company and some 27 other nearby industries. These various tracks within the plant are interconnected and South Buffalo and the Steel Company operates over them. The railroad has some 35 locomotives, steam and Diesels. It owns no freight cars except a few which are used for its own work. It has direct physical connection with five line haul carriers and direct and indirect connection with seven others. South Buffalo is one of seven railroads which is a subsidiary of the Bethlehem Steel Corporation. Each of these railroads serves a plant of the Steel Company. South Buffalo is the only railroad which has served the Steel Company's Lackawanna plant since its acquisition, and approximately 70 per cent of its revenues come from the Steel Company. It delivers to the aforesaid line haul companies materials and products both from the Steel Company and these various industries destined for delivery outside the State or New York and receives over these line haul carriers materials and products for the Steel Company and these various industries.

The Commodities Clause of the Interstate Commerce Act, Section 1(8), so far as material here, reads:

"From and after May first, nineteen hundred and eight, it shall be unlawful for any railroad company to transport from any State, * * *, to any other State, * * *, any article or commodity, * * *, manufactured, mined, or produced by it, or under its authority, * * *, or in which it may have any interest, direct or indirect, * * *."

The purpose of the Commodity Clause was "to divorce the business of transporting commodities in interstate commerce from their manufacture, * * *, and thus to avoid the tendency to discrimination, forbidden by the act to regulate commerce." United States v. Delaware & Hudson Co., 213 U.S. 366, 29 S.Ct. 527, 534, 53 L.Ed. 836: See also United States v. Delaware, Lackawanna & Western R. Co., 238 U.S. 516, 35 S.Ct. 873, 59 L.Ed. 1438; United States v. Elgin, Joliet & Eastern Ry. Co., 298 U.S. 492, 56 S.Ct. 841, 80 L.Ed. 1300. The abuses which the Clause sought to prevent grew out of the common ownership of railroads and coal mines in the Eastern states and the resulting power of discrimination in various ways and thereby suppress competition.

The defendants assert that the Commodities Clause has no application to these defendants; that neither of the parties defendant is a "railroad" within the contemplation of the Clause; that neither transports commodities from one state to another and that, if the three defendants are to be regarded as a single corporate entity, such entity would bring them within the exact language of the "Shippers Allowance Clause," Sec. 15(13) of the Act, 49 U.S.C.A. § 15(13). The merits of these contentions may well be first considered, as a decision upholding any of them would require a dismissal and obviate the necessity of considering the mass of evidence relating to the violation of the Clause.

The claim that the Commodities Clause was inapplicable was raised and presented at considerable length in the briefs in United States v. Elgin, supra. The Supreme Court made no reference to this contention, and it is a fair conclusion that the court saw no merit in it. However, all of the grounds now urged were not presented there.

Defendants term the South Buffalo an "industrially owned switching railroad" whether owned by the industry or a separate company and therefore say the Commodities Clause does not apply. Of course, there are many railroads which are so classified, but this railroad is more than such—more than a terminal facility. Its line of road extends inside and outside the Steel Company plant to the length hereinbefore stated; it serves numerous other industries; transports materials in interstate commerce; files tariffs; has connections with various line haul carriers outside the steel plant; does certain work for the Steel Company outside of transportation; it owns railroad bed and track outside the plant and leases land within; has numerous locomotives; has its own office building, and other essential equipment.

Defendants cite United States v. Terminal Railroad Ass'n, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810, and State ex inf. Attorney General v. Terminal R. Ass'n of St. Louis, 182 Mo. 284, 81 S.W. 395. Neither involved consideration of the Commodities Clause and neither is determinative of what type of a railroad South Buffalo is. The former said there was an "essential difference between terminal systems properly so described and railroad transportation companies." [224 U.S. 383, 32 S.Ct. 512]. There is a wide difference between the terminal system there considered from the system here. Omaha Street Ry. v. Interstate Commerce Commission, 230 U.S. 324, 33 S.Ct. 890, 57 L.Ed. 1501, 46 L.R.A.,N.S., 385, held that the Interstate Commerce Act, as then existing, did not apply to a streetcar company operating a railroad across state lines, and with the conclusion there well may be agreement. In United States v. Delaware & Hudson, supra, most of the business of the company's railroad was the transportation of coal from mines owned by the company. The company contended that its railroad was not a railroad within the purview of the Clause, but a coal company. The court there said: "The contention * * * is without merit. The facts stated * * * leave no doubt that the corporation was engaged as a common carrier by rail in the transportation of coal in the channels of interstate commerce." This was the first case in the Supreme Court construing the Commodities Clause, and no later one holds to the contrary. The size of the railroad and the extent of its business are not determinative that it is an "industrial switching road." Such construction would subvert the purpose of the Commodities Clause with respect to discrimination.

The Commodities Clause applies irrespective of the fact that the South Buffalo does not cross the state line. Property is in interstate commerce from its delivery to the carrier for shipment into another state till delivered to the consignee. "Transportation," as the word is used in different provisions of the Interstate Commerce Act, refers to transportation in interstate commerce.

Section 1(1) of the Interstate Commerce Act provides that, the Act "shall apply to common carriers engaged in—The transportation of passengers or property wholly by railroad, * * * from one State * * * to any other State * * *." Regarding this section, in United States v. Union Stock Yard etc. Co., 226 U.S. 286, 33 S.Ct. 83, 88, 57 L.Ed. 226, the Court said: "That the service is performed wholly in one state can make no difference if it is a part of interstate carriage."

The language in the Commodities Clause, in so far as it relates to transportation, is the same as that in Section 1 of the Elkins Act, Section 41(3) 49 U.S.C.A., formerly Section 2 of the Hepburn Act, and this, in part, fixes the liability of a carrier transporting property from one state to another where a rebate or off set against the regular charge is given. The courts apply this statute where property is transported to and consigned to another state, and even if the line of the guilty railroad does not extend beyond the state of origin. Powell v. United States, 4 Cir., 112 F.2d 764. The Carmack Amendment, Section 20(11), 49 U.S.C.A., as originally enacted, provided that a common carrier receiving property "for transportation from a point in one State * * * to a point in another State * * * shall issue a receipt * * * and shall be liable * * *."

This section has been construed to render a carrier liable whose lines lay entirely within one state but which had accepted property for transportation to another state. Missouri, Kansas & Texas Ry. Co. of Texas v. Plano Milling Co., Tex.Com. App., 231 S.W. 100, certiorari denied 258 U.S 624, 42 S.Ct. 317, 66 L.Ed. 797.

■ The Shippers Allowance Clause, Section 15(13), of the Interstate Commerce Law has no application to a common carrier. Under its provisions allowances are made to the shipper for services furnished in connection with transportation by the shipper through its plant facilities. These services are typified by switching service, pick up delivery, elevator service and other sorts which are part of the transportation itself. The Interstate Commerce Commission and the courts have many times considered the type of service contemplated by the Shippers Allowance Clause. The numerous cases cited by the defendants in this connection illustrate this.

■ South Buffalo is not a facility of the Steel Company. It is a separate corporation. It operates over its own tracks within and outside of the Steel Plant. It serves not only the Steel Company but numerous other industries. The distinction between the status of this railroad and the facility of the shipper is plain. The theory of merger into one entity of the three defendant companies as "owner of property" on the assumption of domination and control of these companies by the Steel Company, as advanced by the defendants, is chimerical. The corporate distinction between the two companies is no way dissolved, and this is not changed though the physical and operational aspects in a case may seem to be commingled. The Allowance and Commodities Clauses apply to different conditions. They are consistent the one with the other. In re Allowances to Kanawha, etc., Ry., 41 I.C.C. 53. The facts in Manufacturers Ry. Co. v. St. Louis, etc., R. Co., 28 I.C.C. 93, are comparable here, and the Commission there stated: "Assuming the newly made carrier to be under the law a common carrier in all respects such as it represents itself to be, it is evident allowances under

Section 15 of the act can no longer be made to the owning industry as for services rendered by the shipper, as the railway is no longer a part of or in law connected with the latter which is 'the owner of the property transported,' to whom alone * * * allowances may be made * * *."

On the question of the application of the Commodities Clause, United States v. Baltimore & Ohio R. Co., 231 U.S. 274, 34 S.Ct. 75, 58 L.Ed. 218, and other cases are cited by defendants. In the Baltimore case, principally relied on, the Supreme Court expressly states that it did not consider the question of the violation of the Commodities Clause because it was not raised before or considered by the Commission. Further, the partnership operating the terminals was not a party to the suit.

The American Short Line Railroad Association, appearing as Amicus Curiae, has raised the points urged by defendants to which we have referred and has also submitted an extensive brief on the history of the Commodities Clause. This history does not demonstrate the intent of the Congress to limit the prohibitions of the Commodities Clause to railroads which cross state lines.

■ Neither the ownership by the Holding Company of all of the shares of stock in both the railroad and the steel company nor the power of control incident thereto is sufficient standing alone to sustain the violation charged herein. United States v. Elgin, supra. But "domination may spring as readily from subtle or unexercised power as from arbitrary imposition of command." North Am. Co. v. Securities Exchange Com'n, 66 S.Ct. 785, 790. The question here is what control the Holding Company did exercise and whether it amounts to such domination as makes one subsidiary a mere agent of another. As such agent the railroad would have an "indirect" interest in the commodities of the Steel Company which it transports. United States v. Reading Co., 253 U.S. 26, 60, 61, 40 S.Ct. 425, 64 L.Ed. 760; United States v. Elgin, supra; United States v. Lehigh Valley R. Co., 220 U.S. 257, 31 S.Ct. 387, 55 L.Ed. 458. Whether such domina-

tion has been exercised to the extent that brings this transportation in interstate commerce within the condemnation of the Clause is a question of fact to be determined on all of the evidence presented.

It is important to compare some of the facts found in the Elgin case as a basis for the application of the law with those found here, and we believe it is helpful to show these in juxtaposition.

| United States v. Elgin etc. | United States v. South Buffalo et al. |
| --- | --- |
| Holding Corporation owned all stock of subsidiary. | Holding Corporation owned all stock of subsidiary. |
| Holding Corporation controlled election of directors. | Same power of control. |
| Interlocking directorate for many years. 4 directors or officers of Holding Corporation directors of subsidiary. | No interlocking directorate. No officer or director of Holding Corporation or Steel Company ever an officer or director of South Buffalo. |
| Many contracts undertaken by Holding Corporation before approval by subsidiary. | No comparable facts. |
| Holding Corporation approved declaration of dividends. | Evidence does not show that the Holding Corporation approved. Government suggests only that approval is to be inferred. |
| All major projects were approved by Holding Corporation and all capital account expenditures over $5000 required Holding Corporation approval. ¾ of all capital expenditures approved at times. | No approval required by the Holding Corporation. |
| All purchases of land required Holding Corporation's approval. | No such requirement. |
| Holding Corporation designated bank depositories and controlled much of the cash funds of subsidiaries and designated certain banks as depositories of subsidiary. | No comparable facts. No funds commingled with the Holding Corporation funds or the Steel Company funds. |
| Reports of all expenditures and where made were required to be submitted quarterly by subsidiary. | No comparable requirement until 1943. |
| Holding Corporation had a clearance account by which monthly settlements were made of accounts existing between subsidiaries. | No comparable situation. |
| All purchases of land had to have Holding Corporation approval. | No comparable requirement. |
| All projects involving agreements of major importance were submitted to Holding Corporation. | No such requirement. |
| Budget estimates submitted by subsidiary to Holding Corporation. | Nothing comparable here. |

Holding Corporation had a bonus plan, pension plan, stock purchase plan.

The Elgin leased Lake Shore Ry. and made a trackage agreement with the Chicago & Ill. Ry. with the active participation of the Holding Corporation with the President of Elgin.

Holding Corporation and subsidiary had office in the same building.

Same attorneys for subsidiaries and Holding Corporation.

Holding Corporation has pension plan, relief plan and so-called incentive plan. Incentive plan is for executives and officers of the subsidiaries and the Holding Corporation and was authorized by the Act of Incorporation of the Holding Corporation.

A comparable situation in some respects appears as respects the lease of Northern Operating Co. by the Steel Co. to the subsidiary.

South Buffalo and Holding Corporation did until 1940.

Same attorneys.

It is to be noted that all of the foregoing activities of the Steel Corporation did not continue during all of the time in question in that suit.

The comparison which we have shown is not complete, and there are various other practices both between Elgin and the Steel Company, and between South Buffalo and the Steel Company and the Holding Corporation shown in the record in both cases. We will consider others of the major matters between South Buffalo, the Steel Company and the Holding Corporation which are urged by the government as showing Holding Company domination. It is unnecessary to detail all of such.

We deem it advisable to consider separately the evidence as it relates direct to situations existing prior to 1940 and those subsequent to that date. This is because of a reorganization of South Buffalo effective in 1940.

The government asserts that immediately on the acquisition of South Buffalo in 1922 Bethlehem interests began the radical re-arrangement of the properties between South Buffalo and Bethlehem and a change in the set-up of the South Buffalo organization with the intermingling of the steel and railroad operations. We do not find these to be the facts though Bethlehem interests were placed in a position to control. The record discloses that prior to 1922 the South Buffalo operated tracks West of the Hamburg Turnpike under a lease from Lackawanna Steel Company. (See Industrial Railways case, 29 I.C.C. 212, decided in 1914.) How long it was so operated does not appear. However, we do know it was not in effect in 1920. The maps in evidence show the same general line-up of the railroad within the plant before and after 1922; the officers of South Buffalo, following Bethlehem's acquisition of its stock, continued as such. Only two of these had been associated with any Bethlehem Company prior to their connection with South Buffalo. The President, Vice President and General Superintendent and Secretary and Treasurer continued in such positions for years following the acquisition. Formerly the railway and Lackawanna Steel Company had officers in common. This was not so after Bethlehem's acquisition. Under Lackawanna management the majority of directors were employees of the Lackawanna Steel Company and during a period of years prior to July, 1938, directors who were employees of the Steel Company were in the majority. The form of operation as between the railroad and the Steel Company has long been common in large manufacturing plants. It has proved to have been beneficial financially for South Buffalo. Under the provisions of these leases South Buffalo could not re-locate its tracks or construct additional structures without the Steel Company's approval. The minutes of meetings of South Buffalo's Board and stockholders do not record any action by either party

relative to these leases or to the sale. This seems unusual. The record discloses a "journal voucher" of South Buffalo, dated January 16, 1923, approved for entry both by the auditor of South Buffalo and the Comptroller of Bethlehem Steel Corporation. This purports "to place at original value road and equipment purchases as per Indenture of Sale dated October 10, 1922." The last-mentioned date is the date when Bethlehem acquired both the Lackawanna plant and the stock of South Buffalo. There are also other minor provisions in these leases to which criticism has been directed. We do not believe that the record discloses any material change in policy, practice or procedure by the Bethlehem Company or the Bethlehem Corporation toward South Buffalo following the execution of these leases. Indeed, standing alone far less domination or control appears than was shown in the Elgin case.

A considerable part of the record in this case is made up of Exhibits of letters between officials of South Buffalo and Bethlehem Steel and records from the files of these companies. A considerable number of these letters purport to have been directed by officers of South Buffalo to officials of Bethlehem Steel but addressed as officials of South Buffalo. Numerous ones purport to have been signed by officers of the Steel Company over their names as officers of South Buffalo. These and other Exhibits purport to ask, advise or seek authority from officials of Steel Company, and some purport to have been written by officers of the Steel Company giving directions with regard to certain operations, purchases and other concerns of the South Buffalo. These communications cover a period of time commencing with 1923 and continuing until 1939. These Exhibits number altogether something a little upwards of 100. There is a considerable number of these which on their face do not tend to show control or are shown by their connection to relate to conduct or acts entirely consistent with independent operations. It is not necessary to refer in detail to this correspondence or file records. It is sufficient to refer to them somewhat generally in order to show their character.

Most of these communications from South Buffalo were directed to Gross, General Traffic Manager of Steel Company, as General Traffic Manager of South Buffalo, to Burns, General Manager of Steel Company, as General Manager of South Buffalo, and to Entwisle, General Manager of Steel Company, as General Manager of South Buffalo. Many of these communications were written by or to Benning, Vice President and General Manager of South Buffalo, commencing as early as 1924 and continue through to as late as 1938. There are no less than 27 of these written by the Vice President of South Buffalo.

These communications and file records, among other things, relate or refer to transportation costs, repair of cars, extension of railroad lines, sale of property, purchase of equipment, rates of pay for South Buffalo personnel, track constructions, construction of buildings, and other matters concerning the management and operation of the railroad.

Gross denies any knowledge of numerous letters purported to have been signed by him. But these were received in evidence by stipulation, subject only to the right to an objection as to their relevancy or materiality.

In 1926 Seneca Iron & Steel Company, an industrial plant on the line of South Buffalo, requested of the railroad a reduction in switching charges. A letter from South Buffalo to Gross, "General Traffic Manager" of the Steel Company, at Bethlehem, Pennsylvania, asked whether the request should be granted. A reply came on South Buffalo stationery, purporting to be signed by Gross, styling himself "General Traffic Manager," and stating that it should not be granted. Defendants admit that this "may represent an isolated deviation from sound corporate practice."

In 1931, on numerous occasions, the Vice President and General Manager of South Buffalo wrote Gross, addressing him as "General Traffic Manager" of South Buffalo, regarding the encroachment of the Thawing House of the Sintering Company on land of South Buffalo and regarding the purchase of a plant locomotive or

the use of one in connection with the Sintering Company and repeatedly requested the advice of Gross.

Prior to 1941, South Buffalo had trackage rights over a strip of an old railroad line lying East of the Hamburg Turnpike. The trackage was then owned by the Northern Operating Company, subsidiary of the Nickel Plate Land Owning Company. South Buffalo used this as a connecting link between its main line and its tracks at the so-called Seneca and Kalman plants which were purchased by the Steel Company in 1931–1932.

The Steel Company initiated action looking to the purchase of the strip. This was then primarily taken for the benefit of South Buffalo. There are in the record several letters purporting to have been written by Gross as "Vice President" to Burns as "General Manager." Both held such position with the Steel Company at that time. They are written on South Buffalo stationery. Gross has denied all knowledge of these letters. One K. A. Kemmerer, until some time in 1932 when he became President of all subsidiary railroads, was an employee of the Steel Company. The letters purport to have been dictated by "K.A.K." The initials evidently refer to Kemmerer. There is also a letter purporting to have been written by Gross on South Buffalo stationery, directed to James, Chief Engineer and Burns, General Manager. James was Chief Engineer of the Steel Company. Kemmerer is now deceased. Whether Gross signed or authorized the signing of his name to the letters is of importance because he was an Executive officer of the Steel Company. The evidence justifies the conclusion that the Steel Company officials were knowing to the contemplated purchase of the land. In 1937, Benning, Vice President and General Manager of South Buffalo, brought up with the Steel Company the proposal that South Buffalo buy the strip, as is shown by letters from him to Entwisle, then General Manager of the Steel Company. Nothing came of this. In 1941 the Steel Company bought the strip and later made a trackage agreement with South Buffalo for the use of it. One can not escape the conclusion that Gross either signed these or authorized the signing by Kemmerer.

In 1936, the Holding Company made two contributions to the capital of South Buffalo. One was to make up a deficit of $211,616, as shown on the books of the parent corporation at the end of 1935 and one of $1,900,000 was to enable South Buffalo to reduce an indebtedness in excess of $2,000,000 to the parent company. As to the deficit of $211,616, this contribution was made in order that a surtax might be avoided. The net earnings for 1936 as shown on the accounts of the railway amounted to $500,792. Under New York law the railroad could not declare or pay any dividend which impaired its capital. Under the Federal statutes, a surtax upon undistributed net income was imposed. To avoid the risk of a surcharge and the violation of the state law, the Holding Company contributed to the capital of the railroad, $211,616, the amount of the 1935 deficit. The contribution of $1,900,000 to the capital was made to avoid payment of the penalty surtax provided for by the Federal Revenue Act of 1936, § 14, 26 U.S.C.A. Int.Rev.Acts, page 823. There appeared to be only two methods by which such penalty tax could be avoided, by the railroad acquiring cash, or its equivalent, by means other than borrowing. For various reasons the issue of additional stock seemed inadvisable, and finally it was decided that the debt of the railroad to the amount of $1,900,000 should be discharged by contribution to capital. The fact of the contributions is not criticized. It is asserted and the proofs show that all the matters relative to the initiation and the naming of the contributions were carried out by the Holding Company. The railroad does not appear to have been consulted or to have had any part in them. The resolution adopted by the railroad on July 10, 1936, pointed to by the defendants, relates entirely to an interest arrangement of April, 1936. The Holding Company had a right, as creditor and sole stockholder to initiate the contribution proceedings and to lay down terms, but in ignoring the railroad in them, it indicates the exercise of the power of control over railroad.

The unity of Bethlehem is claimed to be demonstrated in maintenance of an incentive compensation fund and its benefit relief plan. The former is compulsory under the Holding Company's Certificate of Incorporation. (Article Tenth) Payments under it are made only to executives of the Holding Company and its subsidiaries. The relief plan is operated solely by the employees themselves. As indicated, the Elgin case discloses a like plan. Further there is the aforesaid pension plan. We see nothing out of the usual in any of these plans and nothing indicating control over this subsidiary.

With reference to the employees benefit plans, requiring filing of detailed reports with the Holding Company and common counsel and occupancy of adjacent offices by South Buffalo and the Steel Company, the Government says: "These matters, heavily relied on by the Government in the Elgin case, have not been stressed in this case." Filing of detailed reports was first required in 1943. After 1940, South Buffalo had its separate office building.

At one time the Supervisor for employment for the Steel Company performed services in engaging employees for South Buffalo; South Buffalo's Chief Engineer was on the Steel Company pay roll; no demurrage charge was made by South Buffalo for the Steel Company cars when standing on South Buffalo tracks. The extent of liability for demurrage, however, does not appear. The attempt has not been made to show all the evidence bearing on the relations of the parties defendant. It is sufficiently established that prior to December 5, 1939, South Buffalo for many years had transported articles and commodities manufactured and produced by the Steel Company and raw materials consigned to the Steel Company, in all of which South Buffalo had an interest, in violation of the Commodities Clause. That interest results by reason of the control and the domination of the Holding Company and the Steel Company of the affairs of South Buffalo and the commingling of the identity and community of interest between the three. Much of the evidence bearing on the question of control comes from the many written communications and records of the parties extending over a period of many years. Other evidence, however, comes from other transactions, which considered alone might have little weight, but which coupled with these communications are of material weight.

The Elgin case was decided in 1936. This led to making certain changes in the South Buffalo organization. In 1938, five directors of the railroad who were Steel Company employees, resigned and in their places employees of South Buffalo were elected. The total directorate consists of nine South Buffalo employees. On December 5, 1939, further changes were made. The Holding Corporation arranged and carried out this reorganization. It had the legal right to do this. It requested and received the resignation of all but two of the directors of South Buffalo and of its President, and in their places seven persons, none of whom theretofore had been directors of the railway, were elected directors and of the seven, five were not and had never been connected with it. At all times since the date last-mentioned, the majority of the Board have been outside directors. The government states that there is "very little tangible evidence of domination * * * subsequent to the reorganization." If proofs of acts of the defendants subsequent to 1939 must be considered in connection with acts prior to that date in determining the question of liability, it is clear that a case of domination by the Holding Company is established. However, it is believed the evidence supports the conclusion that the reorganization as perfected in 1939 was entered into in good faith and that the period intervening that date and the date of the commencement of this action should be considered separate and apart from the transactions and activities preceding that date. Referring to the Elgin case, the government says "a material part of the instances stressed by the government had taken place years ago, * * *." That is largely so here.

Mainly, the tangible evidence of domination since 1940, as claimed by the government, is purchase of the Northern

Operating Company and the execution of a lease to South Buffalo in or about 1941, the sale of certain dock property owned by South Buffalo in 1940, the violation of the coal freeze order in or about 1943, operations by South Buffalo in connection with the movement of material between different points within the plant, the method of billing of movement of cars, requirement for daily itemized statements of the operation of the railroad and certain other acts of minor significance and detail.

Bethlehem Steel had purchased the land adjacent to the Northern Operating Company right of way. Whether it should construct a railroad across this adjacent land or buy Northern Operating Company's right of way was a question under consideration. The Steel Company had a direct interest since it was concerned with access to its Seneca and Kalman plants. In giving South Buffalo a lease over this strip it was doing only what had been done under comparable situations within its plant.

South Buffalo owned the so-called Dock Property on the Union Canal. This canal extends from Lake Erie East across Hamburg Turnpike. South Buffalo had owned this for some years, and it had been for some years the subject of a license from the South Buffalo to the Steel Company. The Government's brief says: "The Dock Property was not a profitable investment for South Buffalo. It was a dead horse or a white elephant." The project of developing an Ex-Lake business had failed. In 1940 South Buffalo sold this property to the Steel Company for $391,000, the price at which South Buffalo carried it on its books. There is no other evidence of the value of the property. It was promptly sold following the reorganization. Nothing in this sale shows domination by the Steel Company.

The Interstate Commerce Commission in 1943 issued what is known as the "Coal Freeze Order." It continued in effect about three days. It directed that no railroad should deliver any coal on its lines to consignees without a certificate of the War Production Board showing that it had less than ten days' supply of coal on hand. This order did not forbid delivery

of coal from the line haul railroads to South Buffalo. South Buffalo serves two heavy consumers of coal, and this constitutes a large part of its in-bound traffic. It accumulated a considerable number of cars of coal at this time, and this created some congestion. South Buffalo received no certificate permitting delivery of coal to any consumer during this period. The Railroad reported daily to the Interstate Commerce Commission the amount of coal it had. There is nothing to show any connection in this matter with the Steel Company or the Holding Company.

Considerable evidence has been given relative to the operations of the railroad in connection with the transfer of materials within the Steel plant. These operations were at the blast furnaces, the open-hearths and the slag dump. The principal raw materials used in blast furnaces are ore, limestone and coke. These materials are mostly moved by the Steel Company from storage or from ships. The railroad handles to the blast furnaces a small amount of ore and turnings. Pig iron and slag are produced by the blast furnaces. This pig iron is moved by the railroad to the open-hearth furnaces. The Steel Company moves the ingots from the open-hearth furnaces to the soaking pits. The railroad moves the slag to the dump.

The Steel Company had a posted Schedule indicating the times the blast furnaces were supposed to cast and the destination to which the metal was to be moved. It is claimed that on observations made of the operations of the plant, in numerous instances, it appeared the schedule was not closely followed and that the variance demonstrated co-ordination between the requirements of the Steel Company and the service by South Buffalo. Considering the nature of the work and its volume, we believe nothing abnormal has been shown. The Steel Company benefited by operating on the schedule and naturally would attempt so to do. The railroad unadvised of probable delays had to stand by on occasions. In a sense it co-ordinated its efforts to those of the Steel Company, but this is not shown to have been purposely done. In the instances of delays of locomotive at the slag dump, they are fully

explained and justified by the work of the locomotive required there.

The government further urges that all this kind of a switching service should be furnished by Steel Company itself and not by a separate company. Whether it should or should not, the legality of this type of service has been many times sustained by the courts. The service is compensated under tariff charges, and it is not included in the line haul rate.

When South Buffalo's General Superintendent learned of some unnecessary delays in the operations of its locomotives, he promptly took steps to stop them. The evidence discloses some of the particular instances where movements out of the ordinary occurred. Most of them are of no significance. Such is one where Steel Company employees pulled a car from the South Buffalo track to the Steel Company track for unloading.

The government stresses South Buffalo's method of rendering its bills to the steel company for switching service. No purpose of favoritism to the Steel Company is seen in this. In substance all this amounts to is that, when some shipment is not included in the shipper's order, South Buffalo makes out a paper showing the movement of the omitted shipment, this together with the shipper's order to the car department and a daily bill is rendered the Steel Company. The method employed may seem a little loose as regards the Steel Company, because there was no regular shipper's order for shipment omitted from the shipper's order. Ultimately the Steel Company is in a position to check all shipments. The facts do not evidence co-ordination or an integrated organization.

Attention has been drawn to the personnel of the Board of Directors of South Buffalo and specially to those members of the Board of Directors who had never been connected with Bethlehem's interests prior to 1940. It is claimed that the activities and the inactivities of the Board demonstrate that they have in numerous matters been influenced by the Holding Company and that this shows domination. The outside directors are all of them men of business experience and most of them have been or were connected with business interests of considerable importance and volume. The ability of each member of the Board is clearly demonstrated. The Board met regularly and as is the case usually in the work of any Board of Directors, it considered and acted on all matters presented by its officers. Necessarily they depended to a large extent upon the recommendations of these officials who had direct and immediate charge of operation. Each of these outside directors testified that at no time had he any understanding with the Steel Company or the Holding Company or any of their officers or representatives as to what action should be taken by them. So far as this record discloses, each of the directors has performed his duties in the sole interest of the railroad. There is some evidence that certain of these directors were not acquainted with certain of the railroad officials, but considering the volume of the work with which the Board was concerned and the number of officials employed, this fact merits little consideration.

There is testimony from various shippers on the line of South Buffalo relating to the kind of service rendered by the railroad to them. This has been offered to show that South Buffalo did render service for them similar to that given the Steel Company and to rebut the claim of favoritism. We believe this testimony is of little material value. The situations as between South Buffalo and these shippers is not comparable with that between South Buffalo and the Steel Company. In the cases of these shippers, South Buffalo owns no tracks within these plant industries. It generally delivers and returns cars, either from an intercharge within the industry plant, or else from the plant industry property line. These industries as a rule do their own switching over their own tracks. None of these has switching service such as that furnished by South Buffalo. It does appear in particular numerous instances that South Buffalo has been called upon by the shippers to perform some particular types of switching service. In the instance of the Republic Steel Corporation, the railroad moves the slag

from the open-hearth to dumping ground, dumps it and returns the empty car to Republic. The so-called blast furnace slag is moved from the Republic plant to the Buffalo Slag Company. The railroad in certain of these industries does spot cars on trestles over bins or hoppers, much as it does in the instance of Steel Company. At times it spots cars at points designated by the industry within the industry plant, and performs certain other special switching movements. But, as we have stated, it is hardly comparable with the Steel Plant and South Buffalo set-up.

It is further claimed by the defendants that the evidence of the industry representatives is material to show that the services rendered to these shippers was satisfactory. This, again, we say we do not think is material. The fact remains, however, that South Buffalo was within its legal rights in the maintenance of its switching facilities within the Steel Company plant.

It is true that there are other transactions between South Buffalo and the Steel Company in addition to those to which we have referred which it is claimed, when connected with those to which we have referred, show the influence of the Steel Company and the Holding Company upon South Buffalo. Assuming these are sufficiently proved, they do not affect the conclusion at which we arrive.

 It is undoubtedly true that the Holding Company at all times has been in a position to control South Buffalo. That would be the usual power of a Holding Company owning all of the stock of a subsidiary. The Holding Company is a legal organization. It is entitled to the rights accorded any other organization or any individual. The burden rests on the Government to show that this power to control has been exercised. That burden has not been met insofar as relates to matters arising since the reorganization. The Government has extended itself to show occurrence which for the most part ordinarily would be found between two companies comparable to the railroad and steel companies.

The purpose of an injunction is to prevent the occurrence of threatened acts in violation of law. The alleged threat here sought to be prevented is the domination and control by the Holding Company over 'South Buffalo. Since 1940 there is not sufficient evidence to show that the Holding Company has dominated nor that it now so threatens. In the absence of proof of threatened domination, the court can not enjoin. There is nothing to enjoin. When, and if, the situation is changed, the Government has its remedy. Whether the Elgin case decision is good law, insofar as concerns the period subsequent to 1940, this case presents much less proof to sustain injunctive relief.

Both the government and the defendants have submitted proposed Findings of Fact and Conclusions of Law. It is incumbent upon the Court to make Findings of Fact and Conclusions of Law. Because of the fact that this decision divides the periods of the activities of South Buffalo in connection with the Steel Company and the Holding Company, it seems advisable to the Court that new Findings be submitted, and perhaps this may be done with the cooperation of both the plaintiff and the defendants.