UNITED STATES *v.* ELGIN, JOLIET & EASTERN RAILWAY CO.

No. 660. Argued April 8, 9, 1936.—Decided May 25, 1936.

*Assistant Solicitor General Bell,* with whom *Solicitor General Reed* and *Messrs. Daniel W. Knowlton, M. S. Huberman,* and *Elmer B. Collins* were on the brief, for the United States.

494

*Mr. Nathan L. Miller,* with whom *Messrs. Kemper K. Knapp, Frank B. Kellogg,* and *Charles S. Belsterling* were on the brief, for appellee.

496

By leave of Court, *Mr. Clarence A. Miller* filed a brief on behalf of The American Short Line Railroad Association, as *amicus curiae*, urging affirmance of the decree of the lower court.

MR. JUSTICE MCREYNOLDS delivered the opinion of the Court.

Appellee, incorporated under the laws of Illinois and Indiana, has been an interstate common carrier by railroad since 1884. It operates the "Chicago Outer Belt Line," 195 miles long, which runs from a point on Lake Michigan, north of Chicago, around that city to South Chicago, Gary and Porter, south and east. This line connects and interchanges freight with every railroad entering Chicago and serves many industrial plants. Among them are certain large producers of steel and steel products, operated by corporations, sometimes called "Subsidiaries," all of whose shares belong to the United States Steel Corporation: Illinois Steel Company, American Bridge Company, American Sheet and Tin Plate Company, National Tube Company, American Steel and Wire Company, and Cyclone Fence Company. Transportation of products—raw, semi-finished and finished—to and from and amongst the plants of the six constitutes 60% of appellee's business. It files tariffs and complies generally with the Interstate Commerce Act and Commission regulations. During the years 1926–1930, its annual operating revenue exceeded $20,000,000.

The United States Steel Corporation, a holding—non-operating—corporation organized in 1901, then acquired and has ever since held, all shares of appellee, also all those of the producing companies.

By an Original Bill filed 1930 (amended 1932), the United States instituted this proceeding against appellee, sole defendant, in the District Court, Northern Dis-

trict of Illinois. They alleged that by transporting articles manufactured, mined, produced, or owned by subsidiaries of the United States Steel Corporation, appellee violated the Commodities Clause of the Interstate Commerce Act, Act June 29, 1906, c. 3591, 34 Stat. 584, 585; U. S. C., Title 49, § 1 (8), copied in the margin,[1] and asked for an injunction prohibiting such action.

After answer, voluminous evidence and trial, the court below made findings of fact and announced an opinion. It concluded—

Mere ownership by the United States Steel Corporation of all shares of both appellee and a producing subsidiary was not enough to show that products made or owned by the latter were articles or commodities produced by the former, or under its authority, or which it owned in whole or in part, or in which it had an interest, direct or indirect, and was forbidden to transport by the Commodities Clause.

Also, "no single piece of evidence taken alone, nor all taken together and considered as a whole warrant the inference that the defendant and the producing and manufacturing subsidiaries are under the domination, control, direction, and management of the Steel Corporation, in the sense that the defendant and the other subsidiaries are mere departments, branches, adjuncts, and instrumentalities of the Steel Corporation. The evidence fails to show that the defendant has any interest, direct or indi-

---

[1] From and after May first, nineteen hundred and eight, it shall be unlawful for any railroad company to transport from any State, Territory, or the District of Columbia, to any other State, Territory, or the District of Columbia; or to any foreign country, any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by it, or under its authority, or which it may own in whole, or in part, or in which it may have any interest, direct or indirect, except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier.

rect, legal or equitable, in the articles or commodities which it transports for the subsidiaries of the Steel Corporation."

A final decree dismissed the Bill for want of equity and the cause is here by direct appeal (U. S. C., Title 49, § 45). Both conclusions are challenged and we are asked to reverse the decree and grant relief as originally prayed.

---

The Commodities Clause became part of the Interstate Commerce Act in 1906, U. S. C., Title 49, § 1 (8), and has remained without material change. It was first interpreted here in *United States* v. *Delaware & Hudson Co.*, (1909) 213 U. S. 366, 415, where, by Mr. Justice White, the Court said:

"We then construe the statute as prohibiting a railroad company engaged in interstate commerce from transporting in such commerce articles or commodities under the following circumstances and conditions: (*a*) When the article or commodity has been manufactured, mined, or produced by a carrier or under its authority, and, at the time of transportation, the carrier has not in good faith before the act of transportation dissociated itself from such article or commodity; (*b*) When the carrier owns the article or commodity to be transported in whole or in part; (*c*) When the carrier at the time of transportation has an interest, direct or indirect, in a legal or equitable sense in the article or commodity, not including, therefore, articles or commodities manufactured, mined, produced or owned, etc., by a *bona fide* corporation in which the railroad company is a stockholder."

This construction has been accepted and followed in the later cases. *United States* v. *Lehigh Valley R. Co.*, 220 U. S. 257, 266; *United States* v. *Delaware, L. & W. R. Co.*, 238 U. S. 516, 526; *United States* v. *Reading Co.*, 253 U. S. 26, 62; *United States* v. *Lehigh Valley R. Co.*, 254 U. S. 255, 266.

Through Mr. Justice Lamar, the court said, in *United States* v. *Delaware, L. & W. R. Co.*—

"But mere stock ownership by a railroad, or by its stockholders, in a producing company cannot be used as a test by which to determine the legality of the transportation of such company's coal by the interstate carrier. For, when the Commodity Clause was under discussion, attention was called to the fact that there were a number of anthracite roads which at that time owned stock in coal companies. An amendment was then offered which, if adopted, would have made it unlawful for any such road to transport coal belonging to such company. The amendment, however, was voted down; and, in the light of that indication of congressional intent, the Commodity Clause was construed to mean that it was not necessarily unlawful for a railroad company to transport coal belonging to a corporation in which the road held stock. *United States* v. *Delaware & Hudson Co.*, 213 U. S. 414. For a stronger reason, it would not necessarily be illegal for the road to transport coal belonging to a corporation whose stock was held by those who owned the stock of the railroad company."

Notwithstanding the intent imputed to Congress by this opinion, announced in 1915, no amendment has been made to the Commodities Clause. We must, therefore, conclude that the interpretation of the Act then accepted has legislative approval.

It is now insisted that, although a railroad company may own the shares of a producing company and yet transport the latter's products without violating the Commodities Clause, if a holding company acquires the shares of both carrier and producer, then such transportation becomes illegal. The theory is that the subsidiaries of holding companies are necessarily no more than parts of it. Evidently, this is entirely out of harmony with the reasoning advanced to support the construction of the

Act adopted in *United States* v. *Delaware & Hudson Co., supra;* also in direct conflict with the above quoted language from *United States* v. *Delaware, L. & W. R. Co.*

Considering former rulings, it is impossible for us now to declare as matter of law that every company all of whose shares are owned by a holding company necessarily becomes an agent, instrumentality, or department of the latter. Whether such intimate relation exists is a question of fact to be determined upon evidence.

Counsel for appellants submit that the record compels the inference of fact that appellee and the subsidiary producing companies are but departments of the United States Steel Corporation; and that, as in *United States* v. *Reading Co., supra,* we should find the carrier is violating the Commodities Clause. It is not claimed that this inference derives from any single fact, but out of the mass. The following portion of the opinion in *United States* v. *Reading Company* is heavily relied upon—

"But the question which we have presented by this branch of the case [alleged violation of the Commodities Clause] is not the technical one of whether ownership by a railroad company of stock in a coal company renders it unlawful for the former to carry the product of the latter, for here the railroad company did not own any of the stock of the coal company. The real question is whether combining in a single corporation the ownership of all of the stock of a carrier and of all of the stock of a coal company results in such community of interest or title in the product of the latter as to bring the case within the scope of the provisions of the act."

And, having regard to this, they say—"The affirmative answer given in the *Reading* case is controlling here."

Obviously, what was there stated cannot be taken as declaration of an abstract principle; it had application

to the relevant circumstances. Later (pp. 61–62) in the same opinion the essential ones are revealed—

"All three of the Reading companies had the same officers and directors and it was under their authority that the mines were worked and the railroad operated, and they exercised that authority in the one case in precisely the same character as in the other—as officials of the Holding Company. The manner in which the stock of the three was held resulted, and was intended to result, in the abdication of all independent corporate action by both the Railway Company and the Coal Company, involving as it did the surrender to the Holding Company of the entire conduct of their affairs. It would be to subordinate reality to legal form to hold that the coal mined by the Coal Company, under direction of the Holding Company's officials, was not produced by the same 'authority' that operated the Reading Railway lines."

If the evidence here showed the relationship between the holding company, the carrier, and the producing companies to be substantially as in the *Reading* case, that opinion well might be regarded as controlling. But there is material difference and we must look elsewhere for guidance.

Properly to appraise the situation now presented particular attention must be given to the following facts. All shares of appellee and the subsidiary producing companies have been owned by the United States Steel Corporation since 1901. The railroad has been under constant supervision by the Interstate Commerce Commission. In The Matter of Alleged Rebates to the United States Steel Corporation, 36 I. C. C. 557, (1915). It functions as a separate corporate carrier under imme-

diate control of its own directors, no one of whom is on the board of the holding company; it owns all necessary equipment, makes its own contracts, manages its own finances, serves its patrons without discrimination and apparently to their satisfaction. The lawfulness of the relationship between the holding company and subsidiaries was challenged in *United States* v. *United States Steel Corp.*, decided here in 1920, 251 U. S. 417. After long and thorough investigation and consideration, this court held the Anti-trust Act was not being violated. The present proceeding is one to prevent probable future unlawful conduct and not to punish acts long since completed, however reprehensible. "Our consideration should be of not what the Corporation had power to do or did, but what it has now power to do and is doing." *United States* v. *United States Steel Corp., supra*, p. 444.

The court below made definite findings of fact and upon them reached the conclusions stated above. Although criticized, and notwithstanding certain isolated acts may indicate undue control over the carrier at their dates, we think that the findings are essentially correct and support the decree. Instances of participation in the affairs of the appellee by the officers of the United States Steel Corporation, stressed by counsel, are relatively few; a material part of them occurred years ago—some of the more important in 1909. They are not adequate to support the claim that appellee must be regarded as the *alter ego* of its sole stockholder. The mere power to control, the possibility of initiating unlawful conditions, is not enough, as clearly pointed out in *United States* v. *Delaware & Hudson Co., supra*. That a stockholder should show concern about the company's affairs, ask for reports, sometimes consult with its officers, give advice and even

object to proposed action is but the natural outcome of a relationship not inhibited by the Commodities Clause.

We find no adequate reason for disapproving the challenged decree and it must be

*Affirmed.*

Mr. Justice Stone, dissenting.

I think the judgment should be reversed.

The language of the commodities clause, read in the light of its legislative history, can leave no doubt that its purpose was to withhold from every interstate rail carrier the inducement and facility for favoritism and abuse of its powers as a common carrier, which experience had shown are likely to occur when a single business interest occupies the inconsistent position of carrier and shipper. See *United States* v. *Reading Co.*, 253 U. S. 26, 60, 61. Before the enactment of the commodities clause, Congress, by sweeping prohibitions, had made unlawful every form of rebate to shippers and every form of discrimination in carrier rates, service and facilities, injurious to shippers or the public. By the Sherman Act it had forbidden combinations in restraint of interstate commerce. But it did not stop there. The commodities clause was aimed, not at the practices of railroads already penalized, but at the suppression of the power and the favorable opportunity, inseparable from actual control of both shipper and carrier by the same interest, to engage in practices already forbidden and others inimical to the performance of carrier duties to the public. See *Delaware, L. & W. R. Co.* v. *United States,* 231 U. S. 363, 370; *United States* v. *Reading Co., supra.*

It is not denied that the "indirect" interest of the carrier in the commodity transported, at which the statute strikes, may be effected through the instrumentality of a

holding company which owns the stock both of the carrier and the company which manufactures and ships the commodity. This was definitely established by the decision in *United States* v. *Reading Co., supra,* where it was held that the power of control through holding company ownership of all the capital stock both of an interstate rail carrier and a shipper producing the commodity carried, plus an active exercise of that control, are enough to make the transportation unlawful.

While it was recognized, as had been held in *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366, that mere ownership, by a carrier or a shipper, of the stock of the other, does not call the statute into operation, the Court was careful to point out, pp. 62, 63, that "where such ownership of stock is resorted to, not for the purpose of participating in the affairs of the corporation in which it is held in a manner normal and usual with stockholders, but for the purpose of making it a mere agent or instrumentality or department of another company, the courts will look through the forms to the reality of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require." Domination in fact by a holding company both of the rail carrier and the producing shipper of commodities, in addition to its legal power to dominate them, is enough to bring the carrier within the prohibition of the commodities clause.

The only question for our decision is whether the complete power of the United States Steel Corporation, through stock ownership, to dominate both appellee and certain shippers over its lines, has been exercised sufficiently to exemplify the evil which the commodities clause was intended to prevent, and so to bring appellee within its condemnation. It is of no consequence that complaints of rebates by appellee to United States Steel

Corporation subsidiaries have not been sustained, 36 I. C. C. 557, or that the Steel Corporation and its subsidiaries have been held not to infringe the Sherman Anti-Trust Act. *United States* v. *United States Steel Corp.,* 251 U. S. 417. The commodities clause does not forbid rebating or attempts to monopolize interstate commerce, which are dealt with by other statutes. It is concerned with transportation of commodities by a rail carrier where the carrier and the producer and shipper are so dominated by the same interest, through the exercise of power secured by stock ownership, as to make rebates, discriminations, attempts to monopolize and other abuses of carrier power, easy, and their detection and punishment difficult.

It is not important, as the court below thought, that in the relations between the Steel Corporation and its subsidiaries "there was a scrupulous recognition of the separate entities," or that all transactions between them were "in the form of transactions and communications between two separate and distinct corporations," or that the business and accounts of each subsidiary "were kept separate and distinct" from those of others. Nor is it of any moment, as this Court seems to imply, that the affiliates do not have the same officers and directors, and that some years ago they abandoned the practice of maintaining interlocking directorates.

Those familiar with present day methods of corporate control will not be so naïve as to suppose that the complete domination in fact of its subsidiaries by a holding company owning all their stock is in any way inconsistent with scrupulous recognition of their separate corporate entities, or with the maintenance of separate accounts and distinct personnels of officers and directors. Every holding company presupposes a relationship between it and a distinct corporate entity and its power to control the

latter. Where the issue is whether that power has been exercised, "courts will look through the forms to the realities of the relation between the companies as if the corporate agencies did not exist." Hence we are presently concerned with what is in fact done in the Steel Corporation's exercise of its power to control, not with the particular legal forms or methods under cover of which control may in fact be effected. And since we must look to its acts of control, in addition to its power acquired by stock ownership, as the decisive test, we must scrutinize what has occurred in the past as the best indication of the manner and extent of the use which may be made of the power in the future.

In appraising the Steel Corporation's acts of control over the appellee, it is of significance that the dominant interest in the inter-company relationship, unlike that in the earlier cases brought before the Court, is that of production, and not transportation. Appellee, although a common carrier, subject to public duties and responsibilities, is, in its relation to the Steel Corporation and its subsidiaries, but an appanage to their vast steel producing business. While the commodities clause makes no distinction between the one type of domination and the other, such control of a railroad is far more menacing to the public and to rival producers than is domination of producer interests by a carrier. When the carrier interest predominates, extension of its transportation facilities beyond the demands of its producing affiliates, and even to their competitors, with resulting benefit to the public, may well ensue. But where the producing interest is dominant, and the carrier is chiefly engaged in transporting the commodities of producing affiliates, restricted or indifferent service to competing producers and to the public, tardy or inadequate extension of facilities, discrimination in furnishing service and facilities, are dangers especially to be anticipated.

In such a relationship, control of carrier capital accumulation, expansion and expenditure, is a peculiarly convenient and effective means of subordinating carrier public service to the interests of production, by restriction of carrier expansion which would benefit the public and competing producers, or by allowing it only under discriminatory conditions. It is with these general considerations in mind, especially pertinent to the present case, that its facts should be examined.

Since its formation in 1901 the Steel Corporation has owned all the capital stock of the appellee railroad and of the Illinois Steel Company, a manufacturing company which appellee serves. Through lease, in 1909, of the Chicago, Lake Shore and Eastern Railway line, and the acquisition of appurtenant trackage rights over another line, appellee secured and maintains direct transportation facilities between the Illinois Steel Company and mines and quarries, all subsidiaries of the Steel Corporation. Sixty per cent. of appellee's tonnage is furnished by Steel Corporation subsidiaries.

Although the Steel Corporation is exclusively a holding and not an operating company, its by-laws defining the president's duties provide that he "shall have general charge of the business of the corporation relating to manufacturing, mining and transportation." The record shows that this authority is exercised by close and constant supervision over the business and affairs of Steel Corporation subsidiaries, not through the formal proceedings of stockholders and directors meetings, but through conferences and correspondence taking place directly between the officers of the Steel Corporation and those of its subsidiaries.

From 1901 to 1920 there were on appellee's board of directors never less than four officers or directors of the Steel Corporation, selected from its most important officers. Since 1920 the appellee's board of directors has

been selected by appellee's president and elected by him acting as proxy for the Steel Corporation. He has likewise selected the officers, who have been elected by the Board at his suggestion. The record is replete with evidence, chiefly correspondence, showing the complete subservience of appellee's president to the officers of the Steel Corporation in matters of corporate policy. The subservience of appellee's board of directors to its president, and through him in turn to the Steel Corporation, is exemplified by appellee's settled practice from 1910 until the time of suit of entering into contracts without any previous approval by its board of directors. At its annual meeting of directors the contracts which have been previously entered into, and often have already been performed, are ratified and confirmed. This procedure was followed with respect to all contracts, some 2,313 in number, executed on behalf of appellee between 1910 and 1933.

Appellee's fiscal policy has for many years been dominated and rigidly controlled by the Steel Corporation. Dividends have been habitually declared and the amount of them fixed only after securing, by correspondence, the consent and approval of the officers of the Steel Corporation. The Steel Corporation draws to itself the surplus funds of its subsidiaries, including appellee, which are deposited with it, for its own use, often upon its specific request or demand, and at a rate of interest which it fixes. These funds are withdrawn by draft of the subsidiary, payable only upon acceptance by the Steel Corporation, and customarily upon notice given in advance. From 1920 to 1933 appellee's aggregate deposits with the Steel Corporation were $79,000,000, of which $32,000,000 were made at the request or demand of the Steel Corporation.

Since its formation the Steel Corporation has maintained under its direction and control a clearance account, by which monthly settlement is made of inter-company

accounts among its various subsidiaries. All of appellee's settlements of such accounts, except freight charges and traffic claims, are cleared through this account. The account is managed by the controller of the Steel Corporation. Interest is charged or allowed on balances due in the account at a rate of interest fixed by the treasurer of the Steel Corporation. Terms of settlement are controlled by it and not by free bargaining of debtor and creditor.

By direction of the finance committee of the Steel Corporation, its subsidiaries, including appellee, are required to obtain in advance the approval of the committee of all expenditures for capital account and improvements in excess of a specified amount. From 1920 to 1932 the limit was $10,000, since which it has been $5,000. Since 1908 the officers of the Steel Corporation have issued from time to time, to all its subsidiaries, instructions outlining in detail the rules and procedure governing their application to the Steel Corporation for its approval of their expenditures for improvements. This requirement was not perfunctory. Failure to secure from the officers of the Steel Corporation, in advance, the approval of capital expenditures, brought from them by letter or telegram swift reminder of the neglect. Requests for approval of proposed expenditures have been the occasion for careful inquiry by the officers of the Steel Corporation as to their necessity and propriety. In recent years approximately 70 per cent. of appellee's total capital expenditures have been of the class requiring consent by the Steel Corporation.* Included were items directly

---

* Out of an annual average capital expenditure by appellee of approximately $900,000, during each of the years from 1926 to 1930 inclusive, an average of over $600,000 annually required the prior approval of the Steel Corporation. In 1930, appellee made capital expenditures of $1,910,755, of which $1,315,773 required the approval of the Steel Corporation. Appellee's total capital expenditures from 1926 to 1930 amounted to $4,597,925, of which $3,153,817 required such approval.

affecting appellee's transportation service, such as the cost of rolling stock, procuring an adequate water supply for its engines, improvement of its right-of-way, and additional yard facilities.

With such minute and continuous control of capital outlays of appellee by an organization primarily interested in production rather than common carrier service, it is not surprising that the only expansion of appellee during the period of control has been its lease of the line of the Chicago, Lake Shore and Eastern Railway, a subsidiary of a Steel Corporation producing affiliate, the Illinois Steel Company, which it served almost exclusively, and the acquisition through this lease of a trackage privilege over the Chicago & Eastern Illinois Railroad, restricted to the hauling of products of producing subsidiaries of the Steel Corporation—an arrangement by which appellee raised its tonnage from subsidiaries of the Steel Corporation from 25% to 60%.

It was the chairman of the board of the Steel Corporation, not the officers of appellee, who had the deciding voice in determining whether the lease should be taken and who assumed active control of the negotiations for its acquisition. Again, in 1920, when the trackage agreement was subject to cancellation by reason of the receivership of the Chicago & Eastern Illinois, it was the chairman of the board of the Steel Corporation who actively controlled the successful negotiation for a continuance of the agreement.

The record discloses many other forms of actual control of the business and affairs of appellee by the Steel Corporation which it is unnecessary to detail. It is enough that those mentioned, when examined in their setting, show with convincing force that the appellee railroad is in fact obedient to the dominating control of producers of commodities which it transports. In every instance when the Steel Corporation has conceived that it had any

interest to subserve, appellee has willingly done its bidding. In none has there been any indication of a disposition to pursue any policy not at least tacitly approved by the Steel Corporation. The active and continuous control over appellee's finances and expenditures is alone sufficient to create a continuing danger of neglect and abuse of appellee's carrier duties in favor of the dominating production and shipping interest, a temptation and an opportunity which it was the purpose of the commodities clause to forestall. In addition, the Steel Corporation has exerted that power, in the acquisition of the Lake Shore lease and its appurtenant trackage rights, to secure special advantages for its producing subsidiaries. The trackage rights extend only to hauling their own product, not that of their rivals.

This relationship passes far beyond that which is normal between a railroad and its stockholders and establishes a control over appellee's policy as complete as though it were but a department of the Steel Corporation. If the commodities clause permits control such as is exhibited here, one is at a loss to say what scope remains for the operation of the statute. Whatever views may be entertained of the soundness and wisdom of the decision in *United States* v. *Delaware & Hudson Co., supra,* it neither requires nor excuses our reduction of the commodities clause to a cipher in the calculations of those who control the railroads of the country.

MR. JUSTICE BRANDEIS and MR. JUSTICE CARDOZO concur in this opinion.