NATIONAL COAL ASSOCIATION, et al., Appellants,

v.

Donald P. HODEL, U.S. Secretary of the Interior, et al.

No. 85–6090.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 31, 1986.

Decided Aug. 11, 1987.

Jerome H. Simonds, Washington, D.C., with whom Arnold Levy, Harvey A. Levin, John S. Lopatto, III and Thomas Altmeyer, were on the brief for appellants.

Dirk D. Snel, Atty., Dept. of Justice, Washington, D.C., with whom Jacques B. Gelin, Atty., Dept. of Justice was on the brief for appellee, U.S. Secretary of the Interior.

Russell H. Carpenter, Jr., Washington, D.C., with whom Laird Hart was on the brief for appellees, Rocky Mountain Energy Co., et al.

Before WALD, Chief Judge, WILLIAMS, Circuit Judge and WILL,[*] Senior District Judge.

Opinion for the Court *Per Curiam*.[**]

Concurring Opinion filed by Circuit Judge WILLIAMS.

PER CURIAM:

Section 206 of the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1716 (1982), authorizes the Secretary of the Interior to dispose of a "tract of public land or interests therein ... by exchange ... where ... the public interest will be well served by making that exchange...." The National Coal Association and the Mining and Reclamation Council of America challenge the propriety of one such exchange on two grounds. First, they argue that restrictions on coal *leasing* contained in §§ 2(c) and 37 of the Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. §§ 202, 193 (1982), proscribe the exchange. Second, they contend that the Secretary, in his survey of the public interest, failed to consider certain "competitive issues" as closely as he should have. We hold that plaintiffs have standing to raise both issues but lose on the merits.

## I. BACKGROUND

Between 1980 and 1982, Princeton University received several bequests of privately owned land located within the boundaries of Grand Teton National Park in Wyoming. In order to convert its Grand Teton holdings into cash, Princeton offered them for sale to the National Park Service. The Service rejected Princeton's offer for lack of funds.

Equally unsuccessful in attracting a suitable purchaser among conservationist groups, Princeton conceived of a three-way swap: Princeton, along with three similarly situated charitable institutions (Dartmouth College, Vermont Law School, and the Sloan-Kettering Cancer Center), would sell their Grand Teton holdings to Rocky Mountain Energy Co., a private energy development company; the company would in turn exchange them for federal coal lands in the Corral Canyon, Wyoming area. Rocky Mountain already owned several tracts there. These were alternate sections of a checkerboard, products of the federal government's nineteenth-century program for stimulating rail development in the West. Rocky Mountain's consolidation of its Corral Canyon tracts with the government's would yield a large contiguous tract more suitable for economical mining. Moreover, the proximity of the Corral Canyon tracts to rail facilities owned by Union Pacific Railroad Company (Rocky Mountain's affiliate through a common parent, Union Pacific Corporation) would give Rocky Mountain special cost advantages. The proposed swap met the needs of every party involved, providing Princeton with the cash it needed without surrendering the bequests to commercial use; creating additional parkland at no cash cost to the federal government; and facilitating Rocky Mountain's development of its checkerboard coal.

The proposal depended upon the Secretary's exercise of his exchange authority under § 206 of FLPMA. Receiving a favorable recommendation from the Bureau of Land Management ("BLM"), the Secretary invited public comment on the proposal, 47 FED.REG. 40,912 (1982). The responses—including those from environmental organizations, the Governor and several agencies of Wyoming, and the entire Wyoming congressional delegation—were overwhelmingly favorable.

Plaintiffs—trade associations whose collective membership produces most of the nation's coal—and one other firm were the sole dissidents. They raised the two objections posed here, and the Secretary and

* Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d).

** Chief Judge Wald authored Part III and Judge Williams authored Parts I and II.

District Court (on motion for summary judgment) successively rejected them. *National Coal Association v. Hodel,* 617 F.Supp. 584 (D.D.C.1985). We address the MLA and FLPMA claims in turn.

## II. THE MLA

Section 2(c) of the MLA broadly prohibits the grant of federal coal leases to common-carrier railroads:

> No company or corporation operating a common-carrier railroad shall be given or hold a permit or lease under the provisions of [the MLA] ... for any coal deposits except for its own use for railroad purposes....

30 U.S.C. § 202 (1982). The restriction nips in the bud certain potential violations of the so-called "commodities clause" of the Interstate Commerce Act, 49 U.S.C. § 10746 (1982), which prohibits interstate rail carriers from transporting "an article or commodity that ... is manufactured, mined, or produced by the carrier or under its authority...."[1] Section 2(c) is reinforced by § 37 of the MLA, which makes the MLA the exclusive means of disposing of federal coal lands, subject to a qualification that specifically includes the very authority under which the Secretary acted here:

> [T]he deposits of coal ... herein referred to ... shall be subject to disposition only in the form and manner provided in this Act, *except as provided in sections 206* and 209 of the Federal Land Policy and Management Act of 1976....

Pub.L. No. 66–146, § 37, 41 Stat. 437, 451 (1920), *as amended by* Pub.L. No. 95–554, § 4, 92 Stat. 2073, 2074 (1978) (codified at 30 U.S.C. § 193 (1982)) (emphasis added). Nevertheless, plaintiffs contend that the MLA implicitly limits § 206 of FLPMA.

### A. *Standing*

The government challenged plaintiffs' standing only in a footnote, Brief for Secretary at 18 n. 15, to which plaintiffs never responded. Since this court must satisfy itself that it has jurisdiction, however, we address the issue without the benefit of argument by the parties.

Plaintiffs' alleged injury stems from their members' status "as competitors of ... [Rocky Mountain]." Complaint at 40, Joint Appendix ("J.A.") at 40.[2] The exchange, they allege, allows Rocky Mountain economically to mine a large tract of previously unminable land, thereby threatening plaintiffs' members with more rigorous competition.

Since plaintiffs' allegations of competitive threat undoubtedly satisfy constitutional standing requirements, *see Clarke v. Securities Industry Association,* —— U.S. ——, 107 S.Ct. 750, 754 n. 5, 93 L.Ed.2d 757 (1987); *Investment Company Institute v. Camp,* 401 U.S. 617, 620–21, 91 S.Ct. 1091, 1093–94, 28 L.Ed.2d 367 (1971), we address only their prudential standing under § 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 (1982).[3] That inquiry proceeds in two parts. First we must determine whether plaintiffs are "arguably within the zone of interests to be protected or regulated by" the MLA. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The Su-

---

1. While plaintiffs' brief suggests that the exchange "set in motion a violation of the Commodities Clause," Brief for Appellants at A, they advance no argument as to how Rocky Mountain's *ownership* of a coal mine, standing alone, could possibly violate that clause. Further, the commodities clause does not extend to articles owned by a carrier's affiliate unless it is an alter ego. *United States v. Elgin, Joliet & Eastern Railway Co.,* 298 U.S. 492, 501–04, 56 S.Ct. 841, 843–44, 80 L.Ed. 1300 (1936). Accordingly, we take the references as intended merely to show the background and strength of the federal policy associated with § 2(c).

2. Since we find that the allegation of competitive injury suffices to establish standing under the MLA, we need not address whether plaintiffs' allegation that their members are injured "as potential bidders on the Corral Canyon tract," Complaint at 40, J.A. at 40, supplies an alternative source of standing.

3. Plaintiffs here satisfy all elements of associational standing so long as their members have standing. *See Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 342–43, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). For simplicity, therefore, we will occasionally discuss plaintiffs' interests as if they were identical to those of the individual coal companies.

preme Court recently articulated the test as follows:

> In cases [such as this one] where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.

*Clarke*, 107 S.Ct. at 757. If we find that plaintiffs fall within the MLA's zone of interests, we must then examine whether the MLA exhibits a " 'fairly discernible' ... congressional intent to preclude review at [their] behest." *Id.* at 759. Thus, even plaintiffs who are among a statute's prime beneficiaries will lack standing if, for instance, allowance of such suits would severely disrupt the administrative scheme. *Id.* at 757 (citing *Block v. Community Nutrition Institute*, 467 U.S. 340, 348, 104 S.Ct. 2450, 2455, 81 L.Ed.2d 270 (1984)).

The legislative history of § 2(c) provides a sufficient basis for locating plaintiffs within its protected zone. It was enacted out of fear "that if railroads were allowed to own coal mines they would discriminate in transportation against competing coal mines which depended on rail transportation...." *Northern Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265, 271 (7th Cir.1986) [hereinafter cited as *NIPSCO*]; *see* 58 Cong.Rec. 4739 (1919) (remarks of Sen. LaFollette).[4]

█ It is an open question whether § 2(c)'s prohibition encompasses leases to a railroad's *affiliate*. *See NIPSCO*, 799 F.2d at 270–72. But parties complaining of administrative error obviously need not prevail on all issues of statutory interpretation in order to establish standing; were that so, the zone of interests test would not merely implicate but would duplicate the

merits. *Cf. Von Aulock v. Smith*, 720 F.2d 176, 185 (D.C.Cir.1983). Since " 'Congress has arguably legislated against the competition that [plaintiffs seek] to challenge,' " plaintiffs have asserted an interest that bears "a plausible relationship to the policies underlying" the MLA. *Clarke*, 107 S.Ct. at 759 (quoting *Investment Company Institute*, 401 U.S. at 620, 91 S.Ct. at 1094). That is enough.

Nor do there appear any factors, such as existed in *Block*, 467 U.S. at 345–51, 104 S.Ct. at 2453–56, that make "fairly discernible" in the MLA "a congressional intent to preclude review at [plaintiffs'] behest." *Clarke*, 107 S.Ct. at 759. Plaintiffs, therefore, have standing to assert their challenge based on the MLA.

### B. *The Merits*

█ On the merits, plaintiffs' argument would be implausible even in the absence of § 37's explicit exception (added in 1978) for transfers under § 206 of FLPMA. Section 206 itself makes not the slightest allusion to any of the MLA restrictions. Plaintiffs suggest that adherence to the plain meaning of § 206 produces an "unreasonable result" and is in "outright controversion of [MLA] §§ 2(c) and 37...." Brief for Appellants at 18. We see neither absurdity nor contradiction in the plain language. Congress has erected two schemes for disposition of federal coal interests. The leasing scheme potentially applies to every lump of federal coal, and is hedged with restrictions. Section 206 of FLPMA provides for disposition only of lands (including coal lands) sought by other entities; but in return, those entities must offer the government tracts that are especially suitable for federal ownership and of approximately equal value.[5] Thus the scope of § 206 is far more circumscribed, and each exchange affords the government unique

---

4. For evidence of similar purposes for the commodities clause, see *United States v. South Buffalo Railway Co.*, 333 U.S. 771, 793–94, 68 S.Ct. 868, 879, 92 L.Ed. 1077 (1948) (Rutledge, J., dissenting); *United States v. Reading Co.*, 253 U.S. 26, 60–61, 40 S.Ct. 424, 433, 64 L.Ed. 760 (1920).

5. FLPMA § 206(b) provides that where the values of the exchanged lands are not equal, they "shall be equalized by the payment of money," but under no circumstances can the payment "exceed 25 per centum of the total value of the lands ... transferred out of Federal ownership." 43 U.S.C. § 1716(b).

land rather than fungible cash. Congress could naturally have seen these two features as obviating any need to subject the exchanges to the MLA restriction.

After adoption of FLPMA in 1976, Congress evidently realized that § 37 of the MLA could raise doubts about the Secretary's authority to exchange coal lands under § 206. Accordingly, Congress in 1978 amended § 37 to except such exchanges explicitly, limiting § 37 in the clearest language imaginable: The MLA was exclusive "except as provided in sections 206 and 209 of" FLPMA. Pub.L. No. 95–554, § 4, 92 Stat. 2074 (1978) (codified at 30 U.S.C. § 193). If that language did not do the job, none could.

Plaintiffs invoke legislative history in their quest to construe the 1978 amendment into oblivion. But this is one of those cases where the "clarity of [Congress's] language ... makes resort to legislative history unnecessary and unavailing." *Independent Community Bankers Association v. Board of Governors of the Federal Reserve System,* 820 F.2d 428, 434 (D.C. Cir.1987) (citation omitted); *see also Caminetti v. United States,* 242 U.S. 470, 485–90, 37 S.Ct. 192, 194–96, 61 L.Ed. 442 (1917), *quoted in United States v. Dickson,* 816 F.2d 751, 752 (D.C.Cir.1987) (per curiam).

To resolve any doubts, however, we consider the item of legislative history that plaintiffs appear to regard as a smoking gun. It consists of a statement on the House floor by Representative Kazen, the chairman of the subcommittee that considered the 1978 amendment:

> The purpose of the ... [1978 amendment to § 37 of the MLA] is to permit the Secretary to resolve land title problems created by such mineral reservations in situations where no substantial mineral value is involved.

124 CONG.REC. 33,282 (October 3, 1978).

Rep. Kazen's remark makes sense as a partial explanation of the amendment's reference to § *209* of FLPMA; it could not have been intended to cover § 206. Section 209 starts by requiring that "[a]ll conveyances ... by the Secretary, *except* those involving land exchanges provided for in ... [§ 206 of FLPMA], shall reserve to the United States all minerals in the lands...." 43 U.S.C. § 1719(a) (1982) (emphasis added). It proceeds to except from the prohibition conveyances of federal mineral interests where the federal government does not own the surface, if either (1) "there are no known mineral values in the land" or (2) federal retention of mineral rights would thwart a more beneficial nonmineral land use. *Id.* § 1719(b)(1).

Even as to § 209, the Kazen comment is incomplete, as it overlooks the second type of finding that would authorize a mineral grant. It also entirely fails to explain § 206. Whatever the reasons for its incompleteness,[6] a legislator's remark that mentions one function or effect of an enactment cannot negate statutory language that establishes others. *See Consumers Union of U.S., Inc. v. FTC,* 801 F.2d 417, 421 (D.C.Cir.1986); *Block v. Meese,* 793 F.2d 1303, 1310 (D.C.Cir.1986). The Kazen remark is no smoking gun, nor even a water pistol. We give the words of § 37 their full meaning.

### III. FLPMA § 206(a)

As noted above, § 206(a) of FLPMA authorizes the Secretary to dispose of a "[t]ract of public land or interests therein ... by exchange. ..." 43 U.S.C. § 1716(a). In assessing the public interest, the Secretary must

---

**6.** One possible reason is that § 206 was essentially a recodification of exchange authority under § 8 of the Taylor Grazing Act of 1934, Pub.L. No. 73–482, § 8, 48 Stat. 1269, 1272–73 (formerly codified at 43 U.S.C. § 315g(b)) (repealed by FLPMA 1976). The Taylor Act had already accomplished the partial repeal of MLA § 37, by expressly authorizing (but not requiring) the government to "make reservations of minerals" when it exchanged federal for private-

ly owned land. *Id.* § 8 (formerly codified at 43 U.S.C. § 315g(d)); *see Dredge Corp. v. Husite Co.,* 78 Nev. 69, 369 P.2d 676, 684, *cert. denied,* 371 U.S. 821, 83 S.Ct. 39, 9 L.Ed.2d 61 (1962). It was perfectly natural for Rep. Kazen to focus on the feature of the 1978 amendment containing some element of novelty (the ability to sell certain mineral interests under § 209 without complying with the MLA), rather than on one that was primarily confirmatory.

give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife.

*Id.* Plaintiffs argue that the public-interest standard requires the Secretary "to consider the significant competitive issues associated with this exchange." Brief for Appellants at 35.

### A. *Standing*

We have no doubt that plaintiffs' competitive threat allegations are sufficient to meet constitutional standing requirements. *See, e.g., Clarke,* 107 S.Ct. at 754; *Glass Packaging Institute v. Regan,* 737 F.2d 1083, 1087–88 (D.C.Cir.1984). Thus we turn directly to their prudential standing under the APA, and the "zone of interests" inquiry in particular.

The Supreme Court has recently explained the "zone of interests" test in the context of judicial review under the APA.[7] The Court stated:

The zone of interest test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision.... *The test is not meant to be especially demanding;* in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

*Clarke,* 107 S.Ct. at 757 (footnotes and citations omitted; emphasis added). The Court amplified the emphasized clause in a footnote, explaining that in *Data Processing, supra,* it had been sufficient that "the general policy implicit in the National Bank

Act and the Bank Service Corporation Act was 'apparent' and that 'those whose interests are directly affected by a broad or narrow interpretation of the Acts are easily identifiable.'" *Id.* at 757 n. 14.

■ In determining whether plaintiffs' claim passes the zone of interests test, "we are not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes...." *Clarke,* 107 S.Ct. at 758. In this case, it seems profitable to look beyond FLPMA, to flesh out the meaning of the term "public interest" and its application to the coal industry. As we noted earlier, Congress has expressed apprehension, and responded with legislation to prevent, coal-owning railroads from discriminating in transportation against competing coal mines. *See* 30 U.S.C. § 202; *NIPSCO,* 799 F.2d at 271. Similarly, Congress prohibited interstate railroads from transporting commodities produced or mined under their control. *See* 49 U.S.C. § 10746 ("commodities clause").

■ In FLPMA itself, Congress incorporated by reference its prior pronouncement that it was the

continuing policy of the Federal Government ... *to foster and encourage private enterprise* in ... the development of *economically sound and stable domestic mining* ... [and] minerals industries, [and in] the orderly and economic development of domestic mineral resources ... [and] reserves of ... minerals to help *assure satisfaction of industrial, security and environmental needs....*

---

7. The Court emphasized that this articulation of the zone of interests test was one particularly germane to cases brought under the APA, as the test was "most usefully understood as a gloss on the meaning of § 702." *Clarke,* 107 S.Ct. 758 n. 16. The Court did not purport to speak beyond cases brought under the "generous review provisions" of the APA, *id.* (quoting *Data Processing,* 397 U.S. at 156, 90 S.Ct. at 831), an act to be construed as "serving a broad remedial purpose." *Id.* at 755 (quoting *Data Processing*).

When a court adjudicates a case brought under a specific statutory private right of action it

may need to analyze more carefully what actions Congress contemplated in creating that cause of action. *Id.* (citing *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *See also Cargill, Inc. v. Monfort of Colorado, Inc.,* —— U.S. ——, 107 S.Ct. 484, 490, 93 L.Ed.2d 427 (1986) (holding that plaintiff seeking injunction under Clayton Act § 16 must allege an injury "of the type the antitrust laws were designed to prevent ..."); *Water Transport Ass'n v. ICC,* 819 F.2d 1189, 1192 (D.C.Cir.1987) (noting that § 208 of Staggers Act "authorizes only shippers and ports to launch substantive attacks").

30 U.S.C. § 21a (emphasis added).[8] Whether or not Congress intended the Secretary specifically to consider the effects of each proposed exchange on competition (as plaintiffs claim), this language would suffice to bring the fostering of competition at least "arguably" within the zone of interests that FLPMA sought to protect. Competition can be expected to help satisfy "industrial" and "security" needs and move the economy toward efficiency, satisfying "industrial needs" at the lowest cost in resources; efficient competitive production should in turn enhance security by improving the competitive position of domestic firms in international markets. While this may be said of any mineral product, its importance is unusually obvious for a vital energy source such as coal. Cf. 30 U.S.C. § 21a (defining "minerals" to include coal). Procompetitive interests thus fall within the protected zone. Plaintiffs, of course, can come within the zone of interests at least arguably protected by the FLPMA, without any "indication of congressional purpose to benefit" them. Clarke, 107 S.Ct. at 757.[9]

The Department of Justice is required to report annually to Congress on the state of competition in the coal industry, 30 U.S.C. § 208-2, and its 1980 report sheds light on the relevant concerns.[10] In substantial part, that report is devoted to the potential competitive problems associated with leasing coal to railroads and their affiliates. This report followed up on information in a 1978 Justice Department report to Congress in which the possibility was discussed that "the leasing of federal coal to railroads—indeed any participation in the coal industry by railroads—would have an anticompetitive effect." 1980 Report, at 62; J.A. 348. The Justice Department noted that under certain conditions, if

the railroad were to acquire an interest in the coal industry, it would then find it profitable to restrict the amount of coal transported. By doing so it would drive up the price of coal, and in this case, it would share in the increased coal profits.

Id. at 63; J.A. 349. In the coal industry, procompetitive interests include not only competition among coal companies, but also competition between and among coal companies and the railroads that carry their production to market.

Plaintiffs' complaint alleges, among other things, that the Secretary of Interior failed to consider "whether defendant [Rocky Mountain Energy's] acquisition in fee of the Corral Canyon coal ... would expand defendants RME's and [Union Pacific] Railroad's ability to discriminate against competing plaintiff, non-railroad coal producers in setting rates and making hopper-car allocations." J.A. 27. Plaintiffs' comments filed to the proposed exchange, and incorporated as an exhibit to the complaint, describe the feared scenario further:

The non-railroad producer would be subjected to the possibility that its rail carrier would:

---

8. See also 43 U.S.C. § 1701(a)(12) (announcing policy that "public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals ... from the public lands including implementation of ... 30 U.S.C. § 21a ... as it pertains to the public lands").

9. The situation in this case is quite different from that in which a coal company sues to complain of the competitive advantage—e.g., scales of economy or decreased regulatory costs—obtained by another non-railroad coal company as a result of a coal sale or lease. In such a case, the aggrieved party would be a competitor alleging injuries that stem only from increased competition, and it would be surprising indeed if general "public interest" considerations would be read to encompass anti competitive goals. Allowing such a suit to go forward would be "most likely to frustrate than to further statutory objectives." Clarke, 107 S.Ct. at 756 n. 12.

In this case, however, we do not face such a concern. It is quite a different thing to say that a competitor's attempt to diminish competition by excluding a new entrant is inimical to procompetitive concerns, and that a plaintiff coal company—completely dependent for transportation on the only railroad in the region—will not be heard to complain of administrative action which may further that railroad's ability to discriminate against it in setting transportation terms.

10. See U.S. Dept. of Justice, Competition in the Coal Industry (1980) ("1980 Report"); J.A. 283–393.

(a) Use the contract service mechanism to favor coal produced by railroad entities over non-railroad produced coal.

(b) Refuse expansion of tract capacity to serve areas where non-railroad companies were producing in competition with railroad coal; or

(c) Decrease or make unsure the transportation of non-railroad coal to markets.

J.A. 73–74. The 1980 Report confirms that under certain circumstances, a railroad could find it profitable to engage in such anticompetitive behavior. *See* 1980 Report, at 35–36, 63–65; J.A. 322–23, 349–51.

Plaintiffs have alleged that, because of the monopoly position of defendant Union Pacific Railroad in the Green River-Hams

Fork region where Corral Canyon is located, J.A. 24, and because of relative importance of the Union Pacific Railroad in the national transportation system, *id.*, the fee exchange will enhance its ability to injure plaintiffs.[11] They do not seek from this court, however, a determination of whether the Union Pacific Railroad could or would engage in such anticompetitive activity.[12] The thrust of plaintiffs' FLMPA complaint is that the requirement of § 206, that the "public interest ... be well served," including the consideration of competitive impacts, *was ignored.* Whether in fact the Corral Canyon fee exchange was contrary to the public interest is a question for the merits.[13] But in our view plaintiffs are entitled to raise that question.[14]

**11.** *Cf.* 1980 Report, at 63–64 & n. 163; J.A. 349–50 (ability of railroad to shift profits from transportation to coal production related to amount of coal it owns).

**12.** In fact, that is not a determination we could reasonably make from the record before us. Although the 1980 Report does conclude that Union Pacific Railroad lacked market power in the Green River-Hams Fork region because of the availability of cheaper coal from the Powder River region, *id.* at 33, J.A. 320, it also concluded that the Burlington Northern Railroad did have market power with respect to Powder River coal. *Id.* at 38, J.A. 325. But to the extent that Burlington Northern exercises that market power by raising the delivered price of Powder River coal, the competitive limitation on Union Pacific's behavior in the Green River-Hams Fork region diminishes. The 1980 Report further disclaimed any ability to judge the impact of the Staggers Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895, on rates or the competitive environment. *Id.* at 71, J.A. 358. Moreover, that report precedes the 1982 merger of the Missouri Pacific Corporation and the Western Pacific Railroad Company into the Union Pacific Corporation. *See* J.A. 24. Thus the conclusions drawn therein about the Union Pacific Railroad's ability to behave anticompetitively cannot be determinative. Nor need they be, since our concern at this stage is only whether plaintiffs' allegations bring them within the zone of interests of the FLPMA.

We also note that the 1980 Report concluded that excluding railroads from federal coal leasing was anticompetitive, not procompetitive, and that the Justice Department called for the repeal of § 2(c) of the MLA. *See* 1980 Report, at 89, 106; J.A. 375, 391. Congress, however, has rejected that advice and "at bottom the reviewability question turns on congressional intent." *Clarke,* 107 S.Ct. at 758. Thus, we

conclude that regardless of Union Pacific's ability under existing market conditions actually to discriminate against plaintiffs, such allegations are at least arguably within the zone of interests of the FLPMA.

**13.** *See Clarke,* 107 S.Ct. at 756 n. 13 (" 'Congress had arguably legislated against the competition that the petitioners had sought to challenge, and from which flowed their injury. ... [W]hether Congress had indeed prohibited such competition was a question for the merits.' ") (quoting *Investment Company Institute v. Camp,* 401 U.S. 617, 620, 91 S.Ct. 1091, 1094, 28 L.Ed.2d 367 (1971)); *cf. General Chemical Corp. v. ICC,* 817 F.2d 844 (D.C.Cir.1987) (per curiam) (describing ICC's guidelines for assessing railroad market dominance and their application).

**14.** Judge Williams would deny plaintiffs standing to raise the FLPMA claim because they failed to allege that defendant railroad has *market power* in the relevant market. Plaintiffs did allege, however, that the defendant is the *only* railroad in the market and will be able to use its position to engage in *anticompetitive* conduct vis-a-vis plaintiffs. J.A. 24, 27. We think that is a sufficient allegation of potential injury for zone of interests purposes.

Even though as a matter of substantive antitrust law, we might not be justified in inferring the *existence* of market power from monopoly alone, for the purposes of meeting the relatively undemanding zone of interests test, we should certainly be entitled to infer a sufficient *allegation* of market power from a claim that a firm will now be enabled as a result of the challenged action to use its monopoly position to inflict anticompetitive harm upon plaintiffs. If, as we all agree, plaintiffs' interest in avoiding anticompetitive injury arguably comes within the statute's zone of interests, then plaintiffs should need to allege only enough factual infor-

### B. *Merits*

■ In this case, having concluded that competitive concerns are at least arguably within the zone of interests of FLPMA, we need not decide whether in fact, § 206's "public interest" concerns *require* that the Secretary consider the competitive impact of each coal land exchange. The District Court concluded that competitive concerns had been sufficiently considered, and we do not disturb that finding, *see infra.* The Department of the Interior has announced that it will henceforth consider possible antitrust consequences of coal land exchanges, *see* 51 Fed.Reg. 12609 (1986); 43 C.F.R. subpart 2203. The question of whether the statute requires consideration of competitive effects can await another day.

The District Court explicitly rejected plaintiffs' claim that the Secretary had failed to ensure that the coal land exchange be in the public interest, by neglecting to give due consideration to the potential anticompetitive effects of the transaction:

> It is clear that here the Secretary did, in fact, proceed to consider the potential anticompetitive effect of the Corral Canyon exchange, and he properly found that it was not significant enough to preclude a determination that the exchange was in the public interest.

617 F.Supp. 584, 591–92 (D.D.C.1985). Examination of the record confirms that the Secretary indeed addressed plaintiffs' objection that the exchange would have "adverse competitive impacts on the coal industry." Bureau of Land Management Decision of June 2, 1983, at 3; J.A. 213.

The Department of the Interior, through the Wyoming office of the Bureau of Land Management, explained that the coal land exchange was essentially *de minimis* in character: "The Corral Canyon coal represents less than 3% of the federal coal disposed of through lease sale in Wyoming alone in FY 1982." *Id.* at 4; J.A. 214.

They further explained that § 206 exchanges were considered on an ad hoc, case-by-case basis, and that the Teton exchange had been proposed to accomplish "an important public interest objective." *Id.* *See also* 617 F.Supp. at 591 ("When viewed through a practical prism, nothing could be more in the public interest: Princeton and its sister institutions receive capital for their educational or health-providing ventures; parkland in the Grand Teton will remain unspoiled; and a private energy company receives land outside the national parks for commercial mining.").

The Secretary's public interest determination is one involving a variety of factors, the relative weights of which are left in his discretion. We will not second-guess his conclusion that the Teton exchange, even after considering potential anticompetitive effects, was in the public interest.

Accordingly, the decision of the District Court is

*Affirmed.*

WILLIAMS, Circuit Judge, concurring:

I agree with the the court's conclusion in Part III that the District Court properly dismissed the claim under § 206(a) of FLPMA, but would affirm for want of standing rather than on the merits. Even here, my disagreement with the court is a narrow one. All members of the panel agree that procompetitive concerns are "arguably" with the zone of protected interests, while anticompetitive ones are not. Thus, plaintiffs must allege a potential injury from some anticompetitive feature of the Secretary's action. My sole area of disagreement is that I can discern no such allegation.

I write separately first to stress the reasons for restricting "competitor" standing under § 206 of FLPMA to procompetitive claims, second to analyze plaintiffs' claims in light of that standard.

---

mation to make the threat of such anticompetitive injury a credible one. As Judge Williams acknowledges, it is certainly possible that a monopoly railroad that owns coal-producing facilities may be able to engage in anticompetitive discrimination against non-railroad coal producers. To require plaintiffs to allege market power with any greater degree of specificity would inappropriately convert the zone of interests test into a premature mini-trial of the merits of plaintiffs' main substantive "antitrust" argument. *See supra* n. 12.

## A

We deal here with one of the innumerable statutes directing an agency to act in the "public interest." That does not, of course, encompass the private interests of every member of the public. For standing purposes, the first question is whether the public interest even "arguably" encompasses a plaintiff's interest in shelter from competition.

In some special contexts it would. When the core purpose of a statute is to barricade an area from competitive entry, the interests of firms that operate in the reserved area are presumptively congruent with the statutory goal. It is thus appropriate to treat them as "arguably" within the protected zone. *See Clarke v. Securities Industry Association,* —— U.S. ——, 107 S.Ct. 750, 754–59, 93 L.Ed.2d 757 (1987); *FCC v. Sanders Brothers Radio Station,* 309 U.S. 470, 476–77, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940); *Panhandle Producers & Royalty Owners Association v. Economic Regulatory Administration,* 822 F.2d 1105, 1108–09 (D.C.Cir.1987). Once the merely "arguable" zone is pared away, of course, the public interest under such statutes may well be found not to include protection of competitors. *See United States v. FCC,* 652 F.2d 72, 81–88, 102–03 (D.C.Cir.1980) (FCC must consider antitrust concerns in assessing public interest, but even under its entry-restricting enabling statute focus is on protection of competition, not competitors); *see also Cities of Statesville v. Atomic Energy Commission,* 441 F.2d 962, 986–87 (D.C. Cir.1969) (en banc) (Leventhal, J., concurring) ("administration of federal regulatory statutes calling for determinations of the public interest establish the authority, and in some instances the duty, ... to take into account what has been aptly called the nation's 'fundamental national economic policy,' namely the principles of the *antitrust laws*") (emphasis added) (citations and footnote omitted).

But the inferences appropriate to entry-restricting statutes cannot be transposed unthinkingly to every other administrative activity. The general background of federal statutes includes the antitrust laws, with their sweeping national commitment to competition. They reflect a belief that the public interest will generally be advanced by fostering competition rather than by sheltering competitors. Accordingly, in the absence of entry-restriction or some other hint of congressional hostility to competition, it seems appropriate to be skeptical of any claim that interests in restricting competition are even within the broad "arguable" zone.

Here the case for incorporation of the antitrust laws' standards is especially appropriate. As the court points out, FLPMA expresses a direct interest in satisfying "industrial, security and environmental needs"—an interest that competition is likely to advance. Plaintiffs themselves cite 30 U.S.C. § 184(*l*) (1982), which requires the Secretary, before issuing any coal lease, to obtain the advice of the Attorney General "as to whether such lease would create or maintain a situation inconsistent with the antitrust laws." *Id.* § 184(*l*)(2). As FLPMA and § 184(*l*) were adopted by the same Congress, plaintiffs suggest that the latter's concern for competition pervades the former. If so, the interest is clearly in the encouragement of competition, not its suppression.

*Clarke* reminds us to deny standing to a plaintiff whose interests "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." 107 S.Ct. at 757; *see also id.* at 756 n. 12 (the judicial "concern that the plaintiff be 'reliable' carries over to the zone of interest inquiry, which seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives"). The panel unanimously resists plaintiffs' efforts to fold pro- and anti-competitive concerns into a single package. Where a statute reflects an "arguable" concern with fostering competition, parties who cloak their anticompetitive interests in loose talk of "competitive effects" are not suitable plaintiffs.

## B

Plaintiffs here allege injuries of two types. The first is asserted precisely and plausibly, but is of the wrong sort. They contend that mining coal on fee interests, which Rocky Mountain has acquired through the exchange, is considerably less costly than mining on federal leaseholds, which entails royalty costs and regulatory constraints (such as "due diligence" and reporting requirements). Joint Appendix ("J.A.") at 25–26. Moreover, the exchange cures Rocky Mountain's checkerboard problem—the diseconomies that flow from trying to mine small, noncontiguous tracts. J.A. at 29. Plaintiffs contend that these diminished costs put them at a competitive disadvantage. *Id.*

All members of the panel agree in finding no competitive injury here. *See* Majority Opinion ("Maj.") at 530 n. 9. The injury is similar to the plaintiff's claim in *Cargill, Inc. v. Monfort, Inc.,* — U.S. ——, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), that the defendant rival's acquisition of still a third competitor would enable it to achieve "multiplant efficiencies" and thereby to reduce prices. The Court held the injury insufficient for antitrust standing, finding that the antitrust laws do not prevent even a dominant firm from engaging in vigorous price competition. *Id.* at 492. As plaintiffs' injury stems from the anticipated flourishing of competition, it is not arguably within § 206's purposes.

Plaintiffs' complaint also alleges that Rocky Mountain's acquisition of the Corral Canyon coal will expand its and Union Pacific's "ability to discriminate against competing plaintiff, non-railroad coal producers in setting rates and making hopper-car allocations." J.A. at 27. The majority is persuaded that plaintiffs may thereby suffer an anticompetitive injury; I am not.

The complaint does not even attempt to suggest a scenario under which the coal acquisition would engender anticompetitive discrimination by Rocky Mountain and Union Pacific, but the record suggests a possibility. Under special circumstances, a coal-producing railroad might find it profitable to limit rivals' access to its facilities. By curtailing competition in the sale of coal it could shift profits in fact derived from its market power in transportation, which regulation prevents it from collecting, to its coal sales, which escape regulation. A railroad's acquisition of coal reserves may increase the likelihood of such behavior: the more coal, the more likely it is that coal profits to be derived from restricting competitors' access will exceed losses in net transportation revenues. *See generally* DEPARTMENT OF JUSTICE, COMPETITION IN THE COAL INDUSTRY 63–65 (1980) ("1980 Report"), *reprinted in* J.A. at 349–51.

Not all railroads, however, can carry out such a scheme. The Department of Justice has identified three conditions that must exist before a railroad owning coal deposits could injure competition by limiting access to its rail facilities. 1980 Report at 64–65. First, the firm must enjoy market power over transportation of coal to a particular point. Second, regulation must hold its rates at or near marginal cost (at least below what it could recover without regulation). Third, its ability to restrict service must not be effectively regulated.

Plaintiffs' allegations fall conspicuously short of the conditions that would bring this case within the scenario depicted. On the subject of rail regulation, plaintiffs assert that enactment of the Staggers Rail Act of 1980 ("Staggers Act"), Pub.L. No. 96–448, 94 Stat. 1898 (codified as amended at 49 U.S.C. §§ 10101–11913a (1982)), emasculated rail-rate regulation. J.A. at 26–27. That assertion, if true, would establish the *inability* of railroads to secure forbidden anticompetitive benefits: if rate regulation is ineffective, a railroad could capture monopoly profits directly, in transportation. It would have no reason to resort to the subterfuge of constricting the access of its competitors. But it would be unsuitable for the court to rely on plaintiffs' self-defeating allegations, for such reliance would require questionable assumptions about the operation of the Staggers Act, which preserved regulation of rates where a railroad has market power. *See* 49 U.S.C. § 10709(a), (b) (1982); *General Chemical*

*Corp. v. United States,* 817 F.2d 844, 847–48, 850–57 (D.C.Cir.1987) (per curiam).

More destructive of plaintiffs' claim is their failure to allege that Rocky Mountain or Union Pacific enjoys market power in the relevant market. They assert that Union Pacific operates the only line out of the Green River-Hams Fork region where Corral Canyon is located. *See* J.A. at 24. But that alone does not support an inference of market power. If alternative coal supplies at the delivery points provide enough competition, a railroad cannot raise its coal prices no matter how complete its control over a particular rail line. *See General Chemical Corp.,* 817 F.2d at 850–51.

The administrative record here suggests a reason why plaintiffs failed to allege market power. Although the study underlying the 1980 Report did not closely examine competition at coal destinations, its authors appear skeptical that any railroad held market power in such markets. *See* J.A. at 325 n. 81, 364 n. 207. Further, the report specifically finds that Union Pacific has no market power because Powder River coal is much more plentiful and much cheaper to mine than coal in the ... [regions where Corral Canyon is located]. The delivered price of coal from these regions is already too high to allow ... [Union Pacific] to significantly increase its rates without causing utilities to switch to other coal sources.

J.A. at 320; *id.* at 351. The same considerations would obviously prevent Union Pacific from securing monopoly profits on coal by constricting its coal-producing rivals' access to its rail lines.

Of course findings in a government report can neither bind the plaintiffs to this lawsuit nor define this court's jurisdiction. But the 1980 findings strongly suggest that plaintiffs' failure to allege market power was anything but inadvertent.* In short, I find no claim that the coal acquisition here would inflict an anticompetitive injury on plaintiffs.

---

* Assuming, *arguendo,* that the 1982 merger of the Missouri Pacific Corporation and the Western Pacific Railroad Company into the Union Pacific Corporation might have afforded the latter some degree of market power, *see* J.A. at 24, plaintiffs' failure to allege market power even in conclusory terms seems to me to foreclose any inference that they are asserting an injury from a reduction in competition.

While the 1980 Report supports a conclusion that Burlington Northern might raise coal prices from the Powder River region (from which it is the sole transporter), J.A. at 320–25, such conduct would scarcely confer market power on Union Pacific. *Cf.* Maj. at 531 n. 12. There is no reason to suppose that coal is not available from many sources at the prices at which it can be profitably mined in the Green River and Hams Fork regions (served by Union Pacific and including Corral Canyon). Thus, even if Burlington Northern captured the Ricardian rents available from Powder River coal, *cf.* C. HOWE, NATURAL RESOURCE ECONOMICS 78–79 (1979), Green River and Hams Fork suppliers would evidently remain marginal. In any event, plaintiffs' failure even to allege market power should suffice for our purposes.